CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED Ch'ville
MAR 1 6 2007
JOHN F. CORCORAN, CLERK
BY: Fan Coleman
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

DENA BOWERS,

*Plaintiff,*

v.

RECTOR AND VISITORS OF THE UNIVERSITY
OF VIRGINIA, ET AL.,

*Defendants*

CIVIL NO. 3:06cv00041

<u>MEMORANDUM OPINION</u>

JUDGE NORMAN K. MOON

This matter is before the Court on cross motions for summary judgment: Defendants'

Motion for Summary Judgment, filed on January 26, 2007 (docket entry no. 48) and Plaintiff's

Motion for Summary Judgment, filed on January 28, 2007 (docket entry no. 51). For the reasons

that follow, Defendants' Motion for Summary Judgment will be granted in part and denied in

part and Plaintiff's Motion for Summary Judgment will be denied, both in an order to follow.

## I. BACKGROUND

Plaintiff Dena Bowers was an employee of the University of Virginia ("University"),

which, at the time, was trying to persuade the Virginia General Assembly to pass legislation

allowing the University to restructure its pay scale system, allegedly to the detriment of some

University employees.

The local chapter of the National Association for the Advancement of Colored People

("NAACP"), of which Plaintiff was a member, opposed the proposed legislation and met on

October 10, 2005, to discuss the results of their research into the proposals. Kobby Hoffman

("Hoffman"), a fellow University employee and friend of Plaintiff's, was also a member of the

NAACP but could not attend the meeting. Hoffman asked Plaintiff to send Hoffman a copy of

the documents and charts that had been distributed at the NAACP meeting.

Prior to working hours the next morning (October 11, 2005), Plaintiff used her University email account to send to Hoffman what Plaintiff describes as a personal email that included as attached files the documents Hoffman had requested. The documents were, according to Plaintiff, clearly labeled as NAACP documents. Plaintiff alleges that sending the email was not a part of her job and had nothing to do with her University duties. However, she left in place her "signature" or "stamp," which identified her as a University Human Resources employee.

Hoffman, also using her University email account, forwarded Plaintiff's email to an unknown number of other people, some of whom shared it with still others. Hoffman also labeled the attachments as NAACP documents. One of the subsequent recipients sent the attachments to a University employee and elected worker representative E. Howard Booker ("Booker") with a note indicating that Plaintiff had "done the analysis for HR." Booker, believing the documents were official University information and concerned about their contents as a worker representative, used his University email account to forward the email to "hundreds" of other people.

Plaintiff, on learning of the confusion, told Booker and an unknown number of others to clarify that the documents were not from HR, but were from the NAACP. When asked by Booker and others what to do about the negative implications for salary increases and leave policies, she again used her University email to send him a suggested letter to be used as a template for communications with the Governor's office.

Plaintiff stayed home from work on October 20, 2005, because she was ill. Defendant Yoke San Reynolds ("Reynolds"), the University's chief financial officer, called Plaintiff at Plaintiff's home to inquire about the email. Reynolds, who, according to Plaintiff, has no direct supervisory role over her, was joined by others, including Defendants Nat Scurry ("Scurry") and

-2-

Lucinda Childs-White ("Childs-White"), both of whom are Plaintiff's supervisors. During the course of the telephone call, Plaintiff answered all of Defendants' questions except one: from where the information used to create the NAACP documents originated. Plaintiff withheld answering this question because she felt that the answer would call for revealing private NAACP information that the University did not have a right to demand.

Plaintiff met with Childs-White and Scurry on October 21 to discuss possible disciplinary action arising from the email incident.

Approximately one month later, on November 17, 2005, Scurry and Childs-White met with Plaintiff and told her that she was facing termination and that she should "present her defense" by noon on November 21, 2005, because there would be a hearing at 3 p.m. on November 22, 2005. Effective November 17, 2005, Plaintiff was placed on paid leave until the November 22 hearing. Although Plaintiff claims in her complaint that she was then told neither the nature of the claims against her nor what she had done wrong (*see* Compl. ¶ 38), she also claims that Defendants "indicated that this was for sending the email and for her reactions and interactions afterwards" (Pl.'s Mem. in Opp'n to Defs.' 12(b)(6) Mot. to Dismiss and in Supp. of Mot. to Strike 7).

On November 21, Plaintiff asked Scurry to specify the nature of the charges against Plaintiff, but Scurry did not respond. That evening, however, Plaintiff received, "indirectly and from a totally different source," what she claims was either "non-specific" information about the charges (Compl. ¶ 40) or "slightly more specific" information about the charges (Pl.'s Mem. 8).

At 3 p.m. on November 22, Plaintiff met with Scurry and Childs-White and asked for an opportunity to be heard, but Plaintiff was denied such an opportunity. (*See* Pl.'s Mem. 8 ("[S]he

was handed [two] pink slips but her request to speak was refused.")) Scurry and Childs-White informed Plaintiff that her employment with the University had been terminated.

Accordingly, Plaintiff brought this action in Virginia state court and Defendants timely removed it to this Court. Plaintiff originally alleged four causes of action in her complaint: deprivation of procedural due process (Count I); violations of the First Amendment (Count II); civil conspiracy under Virginia law[1] (Count III); and common law breach of contract (Count IV). The Court dismissed two counts pursuant to Rule 12(b)(6) for failure to state a claim upon which relief could be granted: Count III (civil conspiracy) and Count IV (breach of contract); the Court left intact Count I (deprivation of due process) and Count II (First Amendment violations). The Court then granted Defendants' motion for judgment on the pleadings with respect to Defendant University and all individual defendants in their official capacities, leaving only the First Amendment and Due Process claims against Leonard Sandridge ("Sandridge"), Reynolds, Scurry, and Childs-White in their individual capacities.

Plaintiff's First Amendment claims can be summed up thus: (1) Plaintiff was fired in retaliation for exercising her constitutional right to freedom of speech and (2) Plaintiff was fired for her association with the NAACP in that, having identified that the contents of the emailed attachments originated with the NAACP, she was terminated for not revealing how the NAACP had assembled that content. Plaintiff's Due Process claim can be summed up thus: Plaintiff was fired without notice and an opportunity to be heard.

Plaintiff and Defendants have both filed motions for summary judgment.

---

[1] Va. Code Ann. § 18.2–500 (West 2007).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party, determines that the Rule 56(c) standard has been met. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc*, 763 F.2d 604, 610 (4th Cir. 1985).

If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party shows such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

A court must grant a motion for summary judgment if, after adequate time for discovery, the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. The nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... [must] by affidavits or as otherwise provided in ... [Rule 56] set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Indeed, Plaintiff cannot defeat a properly supported motion for summary judgment with

Case 3:06-cv-00041-NKM-JGW   Document 85   Filed 03/16/07   Page 5 of 23   Pageid#: 1816

mere conjecture and speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

## III. DISCUSSION

### A. Defendants Sandridge and Reynolds

Defendants Sandridge (executive vice president and chief operating officer) and Reynolds (vice president and chief financial officer) move for summary judgment in their favor on the grounds that there is no evidence that they were responsible for Plaintiff's firing.

Plaintiff alleged in her complaint that Sandridge, "based on information and belief, supervised the actions of the other individual defendants and contributed to and, based on information and belief, directed in whole or in part the firing of Plaintiff." (Compl. ¶ 5) Plaintiff also alleged that Reynolds, "based on information and belief, answers to Defendant Sandridge and works in conjunction with Defendant Sandridge, and who supervised and directed the actions of the remaining individual defendants in the firing of Plaintiff as set forth below." (Compl. ¶ 6)

As Plaintiff herself points out, Defendants have stated "nakedly" that there is not "a single cite anywhere to the record" to indicate that neither Sandridge nor Reynolds "took any action or made any decision that caused any injury to Plaintiff." True. Defendants have shown that there is zero evidence that Sandridge and Reynolds had anything to do with Plaintiff's firing. Plaintiff argues that because she alleged wrongdoing in her complaint by Sandridge and Reynolds and because Defendants here have failed to disprove her allegations, summary judgment for Defendants is not appropriate. Plaintiff is wrong.

As stated above, the standard of review when a defendant moves for summary judgment is as follows: if the defendant shows an absence of evidence to support the plaintiff's case, the

-6-

burden then shifts to the plaintiff to show that there are genuine issues for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The plaintiff is not permitted to rely on mere allegations, but must instead affirmatively "set forth *specific facts* showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added).

Here, Plaintiff tries to refute Defendants' allegation that there is no evidence that Sandridge and Reynolds had anything to do with Plaintiff's firing by pointing to her complaint and the allegations it contains. Plaintiff states that because she alleged that Sandridge and Reynolds conspired against her, (Compl. ¶ 53), and because "[t]his has not been disproved," (Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. 26 (docket entry no. 61)) summary judgment for Defendants is not appropriate. Plaintiff cannot defeat a properly supported motion for summary judgment, however, by relying on allegations in her complaint.[2]

Plaintiff argues, too, that her evidence shows that these two defendants were active—and perhaps the "*key*"—decision makers in Plaintiff's firing. The evidence before the Court leaves no question that Plaintiff's argument is without merit.

There is simply no evidence whatsoever that Sandridge had any involvement in the case other than being apprised of the goings-on of the fallout of Plaintiff's email, including being told that Plaintiff would be fired. Indeed, Sandridge states that he did not assent to the firing, nor was his assent sought, because the people below him had all the authority necessary to fire Plaintiff.

Plaintiff produces nothing but speculation to rebut this claim. Plaintiff argues that Sandridge "sought most forthrightly to tarnish Plaintiff because of her lobbying in Richmond over the political issue." (Pl.'s Resp. 27) Although the Court cannot consider the exhibit to

---

[2] This is especially true here, where the allegations referred to in Plaintiff's complaint were based solely on "information and belief" and had no factual support in the complaint. It is worth noting, too, that the language to which Plaintiff refers is contained in a part of her complaint alleging conspiracy to harm profession, a claim that was dismissed by this Court in an opinion and order dated October 24, 2006 (docket entry nos. 27, 28).

which this statement refers[3] even if true, it has absolutely no bearing on Defendants' motion for summary judgment. This evidence, even if properly before the Court, would only show the possibility of motive for Sandridge to be involved in Plaintiff's firing. In short, there is no genuine issue of material fact regarding Sandridge's actual involvement in the firing, regardless of any possible motivation for wanting Plaintiff fired.

Plaintiff cites *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999), for support for the proposition that summary judgment may not appropriate in cases dealing with circumstantial evidence of intent. But, as Plaintiff must surely be aware, *Hunt* dealt with alleged racial gerrymandering, meaning intent and motive were germane to that case. *See Hunt*, 526 U.S. at 543. Here, however, Sandridge's motivation for firing Plaintiff (even if he had one and even if evidence of that were properly before the Court) has no bearing on the case if Sandridge had no actual involvement in Plaintiff's firing. The evidence is clear that he had no such involvement.

Reynolds was indisputably more involved, having questioned plaintiff on October 20 via telephone, having discussed the situation on a least a couple of occasions with Sandridge and Scurry, and having "expressed her opinion" to Scurry that Plaintiff should be fired. Again, however, there is no evidence that she was actually behind the firing. She was not present at any of the predetermination hearings nor did she receive detailed reports as to their content. Although aware of the activities of Scurry and Childs-White, there is no indication that she controlled them.

Because Defendants have produced evidence that Reynolds was not the person who made the decision to fire Plaintiff, (*See* Reynolds Aff. ¶¶ 13, 15[4]), Plaintiff must come forward with

---

[3] The Court ruled that Plaintiff's exhibit LL was not properly before the Court because it was not authenticated.

[4] Reynolds's affidavit jumps from paragraph 13 to paragraph 15; there is no numbered paragraph 14.

-8-

specific facts to show that there is a genuine issue of material fact regarding Reynolds involvement. She has not.

If a defendant moving for summary judgment has properly established an absence of evidence, the plaintiff must lose. There is scant evidence on Reynolds's and Sandridge's roles in this matter, and what little evidence there is points to the conclusion that they were responsible neither for Plaintiff's firing nor for any possible deprivations of due process. An active role is essential: § 1983 makes clear that only those who "shall *subject, or cause to be subjected*, any person . . . to the deprivation of any rights" may be liable. 42 U.S.C.A § 1983 (2007). Merely failing to prevent a deprivation is inadequate; such liability would be nearly equivalent to respondeat superior, which is not available in § 1983 cases. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Rizzo v. Goode*, 423 U.S. 362, 377 (1975).

Although Plaintiff is entitled to have all reasonable inferences drawn in her favor, there is simply no evidence supporting her position. Although Sandridge and Reynolds were clearly concerned about Plaintiff's email and its effect on their legislative efforts, it would be unwarranted and extreme to conclude that they were therefore responsible for her firing.

For these reasons, Reynolds and Sandridge must be DISMISSED from this action.

## B. First Amendment and Qualified Immunity

Defendants here have asserted the defense of qualified immunity, which shields government officials performing discretionary functions from civil liability to the extent that "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 265 (4th Cir. 1998) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

An analysis of whether qualified immunity attaches to Defendants requires the Court to address two issues—in order: (1) "identify the right allegedly violated," and (2) "determine whether the constitutional right violated was clearly established at the time of the incident."*S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 265 (4th Cir. 1998); *see also Conn v. Gabbert*, 526 U.S. 286, 290 (1999) ("Thus a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation."). Whether a constitutional right was clearly established is a matter of law for the court to decide; this decision, therefore, can be appropriately made at the summary judgment stage. *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir.1992) ("The narrow threshold question whether a right allegedly violated was clearly established at the appropriate level of inquiry and at the time of the challenged conduct is always a matter of law for the court, hence is always capable of decision at the summary judgment stage.").

With this basic analytical framework in mind, the Court now turns to both of Plaintiff's First Amendment claims.

1. Retaliation for Protected Speech

Plaintiff claims that she was fired, in part, for engaging in protected speech; that is, Plaintiff sent an email from her work computer before the work day began and that email contained information obtained from the NAACP regarding the University's restructuring. Plaintiff claims that this is protected speech for which she was fired—retaliation she says violates her First Amendment rights.

The reasons for her firing are stated in the two "Group II" notices that Plaintiff submitted as Exhibits U and V. They read:

-10-

On or about Oct. 11, 2005, Ms. Bowers knowingly used her university title in conjunction with the dissemination of information by use of her University email account. That information was, in part, not factual, nor did it represent a University position statement on the issues addressed. Following the sending of the email, Ms. Bowers expressly declined the opportunity to clarify the fact that the information disseminated in the email did not emanate from her in her official capacity as a University employee, and collaborated in the further dissemination of the information.

On or about Oct. 20, 2005, when advised of the negative impact of the earlier email, Ms. Bowers refused to provide requested assistance in identifying the source of the information that was distributed, or to cooperate in correcting the misinformation it contained. In response to specific, reasonable concerns about the email and its consequences, Ms. Bowers was uncooperative, disrespectful, and insubordinate.

Pl.'s Exs. U, V.[5]

The first question for qualified immunity purposes is, accepting the written notices as they are, did Plaintiff have a First Amendment right to do these things? Plaintiff's claim divides neatly between the two notices: the first notice concerns her right to speak, and the second her

---

[5] These statements of the reasons for Ms. Bowers' firing must be taken as both authoritative and complete. Both Plaintiff and Defendants have attempted to adduce evidence that they believe tends to show that firing was or was not appropriate and Plaintiff has challenged the factual accuracy of the notices. This is irrelevant, however: the appropriateness of Plaintiff's firing is not before the Court. Rather, this case concerns the alleged violations of Plaintiff's constitutional rights. The wisdom of her firing, the policies (or lack thereof) that she allegedly violated, and the precise facts are matters to be considered under the University's grievance system and perhaps state employment law. "Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." *Connick v. Myers*, 461 U.S. 138, 146 (1983).

The only possible grounds for considering these issues would be based on the allegation of a pretextual firing. If Plaintiff could prove what counsel asserted at the hearing—that the University would not have taken action if Plaintiff's email had said things the upper administration supported—then there would be grounds to look beyond the written notices. However, Plaintiff has produced no such evidence. There are affidavits attesting to the use of the University email system and signatures for personal reasons. What these affidavits lack is proof that confusion akin to that which was engendered here has led to large numbers of employees receiving political advocacy they erroneously believed to be official Human Resources news. Although counsel's assertion is intuitively plausible, there is no actual evidence that would allow the Court to find that it creates a genuine issue of fact that could defeat a motion for summary judgment.

If Plaintiff believes these notices are untrue or do not show a genuine violation of University policy, she should appeal her firing through the appropriate channels. If the University had other, better reasons for firing Plaintiff than these, they should have included them in the notices. Both sides will be held to the contents of the notices.

-11-

right of association in the form of refusal to answer questions about a report created by a committee of the local NAACP.

The law on the use of office email systems is in its infancy, and thus many of the precedents on which the parties rely are inapposite in some important sense. The leading case governing the constitutional right of government employees to speak critically of their employers is *Pickering v. Board of Education*, 391 U.S. 563 (1968). This case, and many of its progeny, might properly be termed "letter-to-the-editor" cases, in which an employee quite intentionally speaks to the public at large, but does so away from work, using private resources.

In such cases, the employee is protected from retaliatory firing if (1) the issue is a matter of public concern, not a private grievance and (2) the speech has not "impeded the [employee's] proper performance of his daily duties ... [or] interfered with the regular operation of the [agency] generally." *Pickering*, 391 U.S. at 572–73. *Pickering* also discussed the allegation by the school board that some of the teacher's statements were false, an issue in this case as well. The Supreme Court concluded that, because it would fly in the face of the need for robust public debate to permit firing based on disagreements, only a showing of knowing or reckless falsity would justify dismissal. *Id.* at 574.

Speech in the workplace, especially that which is "on the clock," is entitled to less protection than is speech in the form of letters to the editor. *Connick*, 461 U.S. at 153; *see also Kannisto v. City of S.F.*, 541 F.2d 841 (9th Cir. 1976). Speech made pursuant to regular job duties receives no First Amendment protection at all because in such contexts, employees are not speaking as citizens for First Amendment purposes. *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006). Furthermore, employees who have a policy-making or public-relations role receive very little First Amendment protection even for "off-the-clock" speech, and may in limited

-12-

circumstances be fired merely for belonging to the wrong political party. *McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998).

In this case, Plaintiff's actions do not fit into any of these categories well. On the one hand, she unquestionably spoke on a matter of public concern—bills being debated by the General Assembly or considered for signature by the Governor's office are inherently matters of public concern. Nor is this Court willing to find as a matter of law that her speech, however flawed, was recklessly or knowingly false. It is uncontested that Plaintiff made at least some effort to find and transmit factual information, and courts should not make First Amendment protection dependant on which side of a political dispute the judge finds more amenable. Plaintiff may well have been wrong, but she was not so wrong as to lose her constitutional rights.

On the other hand, although there is no allegation that Plaintiff used work time to send her email, it is certain that she used University computers. For that reason, this cannot be treated solely as a matter of citizen speech as in the "letter-to-the-editor" cases. Despite the use of work computers, the attachments were not sent out as part of her regular job duties, nor did she have a policy-making or public-relations role that would have made personal involvement in the public debate inappropriate. That fact cuts both ways in this analysis: the University clearly has as much right to regulate non-work use of its email system as it does to control its copiers and telephones; at the same time, however, to the extent that the email was sent as a citizen rather than an employee, it is entitled to greater First Amendment protection.

Both Plaintiff and Defendants mention that the original email was sent to only one person: Plaintiff to defend against implications of rabble-rousing, and Defendant to claim that it was not truly a matter of public concern given the limited initial distribution. Speech need not be widely published to receive protection as being on a matter of public concern; indeed, it may be

-13-

directed at a single person. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414 (1979). Defendants' position is inconsistent with their argument that Plaintiff's activities were disruptive; they cannot simultaneously argue that Plaintiff caused unreasonable disruption by sending a private email to a friend, but that if she had deliberately distributed her message more widely, she would be entitled to constitutional protection. Plaintiff fares little better, however, given that she herself consented to the wider distribution of her email, albeit not necessarily anticipating the full consequences. The limited scope of the initial distribution therefore does not weigh heavily on either side.

The Court's most serous concern arises from the use of the signature or "stamp" at the end of the email that identified the sender (Plaintiff) as an employee of the University's Human Resources department. Unauthorized use of official titles and channels of communication was disapproved by the Eastern District of Virginia in *Banks v. Secretary of the Navy*, 705 F. Supp. 282 (E.D. Va. 1989). In *Banks*, the court dismissed a case brought by a Naval Reservist who had used Navy letterhead and his title to write to Congress. The *Banks* court found that—hypothetically—Congress could easily become confused if it started receiving large numbers of "official" Navy missives. Although the discipline and uniformity required in the military requires a far greater restriction of First Amendment freedoms that may not be appropriate in civilian life, the court's rationale is persuasive even for civilian employees when one considers the *Garcetti* rule that an employee must speak as a citizen to claim protection; use of official letterhead is inconsistent with that requirement.

Here, it is clear that Plaintiff did not have any actual authority to speak on behalf of the Human Resources department. For that reason, cases concerning job duties and public-relations staff are not entirely applicable. There is uncontested evidence that the use of these signatures

-14-

for personal messages was common and Plaintiff herself says she did not think twice about it. But the fact remains that the precise concerns raised *hypothetically* in *Banks*—namely confusion about the official position of an organization because of conflicting "official" messages—*actually* arose in this case. It was the presence of the signature that led others further down the email distribution chain to conclude that the NAACP attachments were in fact some sort of Human Resources documents, documents speaking to issues for which the Human Resources department would normally be responsible. It was the signature—and the false authority it conveyed—that caused the attachments to be sent to the entire classified staff of the University. Plaintiff argues that anyone who had read the documents carefully would have seen that they were prepared by the NAACP and not by Human Resources. This is true, but it is evident that some number of people were careless, starting with Plaintiff, who carelessly failed to remove her signature from a personal message.

Defendants point to *Deschenie v. Board of Education*, 473 F.3d 1271 (10th Cir 2007), a recent Tenth Circuit case, for the proposition that even a message intended to be private can merit disciplinary action if it becomes public, and that the inclusion of an official title in such a private message is a factor in the decision. In *Deschenie*, the plaintiff was the former director of bilingual education for a New Mexico school district. *Deschenie*, 473 F.3d at 1273. When the school board began discussing possible elimination of the bilingual education program in the district (attracting publicity and public controversy, much like the proposed restructuring in this case), the plaintiff wrote a guest column that was published in the local newspaper. *Id.* at 1274. Four months later, the plaintiff wrote a thank-you email to the editor of the newspaper following an editorial that appeared that praised Native American education. *Id.* Although the plaintiff "did not intend for this email to be published, it was published as a letter to the editor." *Id.*

-15-

The district court granted the defendants' motion for summary judgment, finding that although the email involved a matter of public concern, under a *Pickering* balancing test, the email was unprotected speech. *Id.* at 1279. The Tenth Circuit affirmed, stating that the employer had a "strong interest in restricting Deschenie's speech because of the potential disruption which could arise from its apparent inconsistent positions regarding the bilingual education program." *Id.* at 1281. "When a government employee purports to speak on behalf of the government employer, the employer has a strong interest in controlling the speech." *Id.* Most importantly, the court noted that it was "irrelevant that Deschenie did not intend for this letter to be so published because the speech, as ultimately printed, included her title, thus connecting [the school board employer] to the letter." *Id.*

The court then stated that Deschenie's position as not only an employee but director of the bilingual education program weighed in favor of her speech being unprotected. *See id.* Other factors cut against Deschenie: "the highly public nature of the issue and the public's confusion over the intent of the School Board weigh heavily in favor of the Board's interest in setting forth its position as clearly as possible." *Id.* Given the "potential to fuel . . . misconception," the court had little problem finding that Deschenie's speech was unprotected. *See id.*

The Court finds *Banks* and *Deschenie* persuasive. Although Plaintiff was not officially authorized to speak for the University, her email misled others into thinking that she was. For that reason, this Court will hold her to the standards of those who are actually permitted to speak for government agencies: she must stick to the party line or face discipline. Additionally, nobody would think to use University letterhead for personal messages, and email signatures like the one in this case resemble official letterhead closely enough that the two should be treated the same way.

-16-

Plaintiff's statements, by purporting to be Human Resources statements, lose the cloak of First Amendment protection. The Court concludes therefore that Defendants did not violate Plaintiff's First Amendment rights because Plaintiff's activity was not protected under the First Amendment.[6]

## 2. Retaliation for Association

Defendants also claim qualified immunity with respect to Plaintiff's claim that she had a First Amendment right to refuse to answer her supervisors' questions about the source of the information in the attachments she sent out. Again, to determine whether qualified immunity will attach, the Court must answer two questions: (1) whether Defendants violated a constitutional right and (2) whether that right was clearly established at the time the incident arose. Here, the Court concludes that

Although Plaintiff initially claimed that the University had asked her about private membership information, that claim has been withdrawn. All parties agree that the key question that Plaintiff refused to answer was the origin of the information included in her email attachments.

Defendants write that Plaintiff "owed her employer a duty to cooperate and to respond to reasonable requests and inquiries." This formulation is certainly sensible, but it does not support Defendants' position. Although there do not seem to be cases on the subject, it is quite clear that Defendants could not demand that Plaintiff become a mole within a legitimate organization such as the NAACP, reporting its activities back to the University, merely by virtue of her

---

[6] Having answered the first qualified immunity question in the negative, the Court need not address the second question. Even assuming, however, that Plaintiff had a protected First Amendment right regarding sending the email, the Court would almost certainly conclude that that right—as presented in the facts and circumstances of this case—would not be so clearly established as to defeat Defendants' claim of qualified immunity. This should be evident based on the novelty of the facts and circumstances of the case.

-17-

employment. Such a request would hardly be reasonable. If any government employee could be questioned about the activities of organizations they join, government employees will be unwelcome in organizations which might find themselves criticizing the government. This "chilling effect" on employee association is unacceptable under the First Amendment.

Although Plaintiff's free speech claims were vitiated by the manner in which she spoke, her associational claims are not so easily dismissed, for two reasons. First, the sending of the email had nothing to do with her choice to associate with others for social and political advocacy. The same email could have been sent by one who was not a member of the NAACP, or even by one who was hostile to its goals. Thus, although her *speech* was disruptive, her *association* with the NAACP was not disruptive at all, and thus fails the *Pickering* test.

Second, Plaintiff is not alone in claiming that her associational rights would be violated by intrusive questioning; the other members of the NAACP have a right to expect that their private conversations and activities will not be forced into public view by the demands of government employers. Plaintiff was justified in defending her rights and those of her fellow opponents of University restructuring by refusing to answer questions about the sources of data and preparation of her email attachments.

Having concluded that Plaintiff states a claim that Defendants retaliated against her for having exercising a constitutional right, the next question is whether that right was clearly established. Plaintiff's associational right must be clearly established in "'a more particularized, and hence more relevant sense' than simply an abstract statement such as the right to due process." *Gordon v. Kidd*, 971 F.2d 1087, 1096 (4th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an

-18-

official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Id.*

It is obvious that the right to associate, in a broad, general sense, is protected by the Constitution. But here, neither Plaintiff nor Defendant has cited any cases that remotely resemble this one. Plaintiff cites half-century old cases involving the NAACP membership lists and assistance to plaintiffs challenging segregation in court. Defendants failed to cite any cases at all. The Court itself has not be able to find any cases that deal with the right of government employees to refuse to divulge the source of information allegedly received from outside the workplace, but that then becomes of interest to the employer based on the employee's subsequent conduct in transmitting that information. Accordingly, this right cannot be said to be "clearly established," and qualified immunity must attach.

### 3. Procedural Due Process

Finally, the parties agree that Plaintiff was entitled to due process protection.Government employees with a protected property interest enjoy the protection of the Due Process Clause. *Gilbert v. Homar*, 520 U.S. 924, 928 (1997) ("The protections of the Due Process Clause apply to government deprivation of those perquisites of government employment in which the employee has a constitutionally protected 'property' interest."). In other words, a government plaintiff who can only be fired for cause has a property interest in continued employment. *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 538 (1985). Plaintiff and Defendants agree that Plaintiff here has a constitutionally protected property interest in her continued employment.

In this case, there were three separate meetings between Childs-White, Scurry, and Plaintiff; all three were described as "predetermination hearings." These took place on October

-19-

21, November 17, and November 22. Plaintiff claims—without any legal support—that her due process rights were triggered as of the November 17 meeting, at which time she was placed on paid leave.

At that meeting, Plaintiff agrees that she asked "if she was being fired, then became emotional, stating that she couldn't believe that she was 'being fired over this,' and that 'you should just take a knife and stab me in my heart'" and that "'[y]ou can shoot me.'" (Mem. in Supp. of Defs.' Mot. for Summ. J. 23 (quoting Childs-White aff. ¶ 16)) Plaintiff argues that "if true, these emotional responses by Plaintiff support the position that she *was in fact* fired from her 17-year job at that very moment in time, [and was] not merely being told of [the] charges [against her] with a meaningful 'opportunity' to address the charges in the future." (Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. 25) Plaintiff claims that this shows she was de facto fired on November 17. "She was *already* fired, and she knew it." *Id.*

Plaintiff's argument has no legal authority to support it. In fact, the legal authority relevant to Plaintiff's argument states just the opposite. Indeed, this very Court—relying in part on *Loudermill*—held that "suspension with pay," even if for punitive reasons does not trigger due process rights. *See Mansoor v. County of Albemarle*, 124 F. Supp. 2d 367, 380 (W.D. Va. 2000) (citing *Loudermill* for the proposition that an employer "can avoid the [due process] problem by suspending with pay" and *Edwards v. Cali. Univ. of Pa.*, 156 F.3d 488, 492 (3d Cir.1998), which held that neither suspension with pay nor resultant stigma to reputation unconstitutionally deprived former university employee plaintiff of property or liberty interests).

The meeting five days later (on November 22), at which time Plaintiff was actually fired, is what has triggered Plaintiff's due process rights.

The Supreme Court made clear in *Loudermill* what pre-termination process is required: notice and an opportunity to respond. *Loudermill*, 470 U.S. at 546 ("The essential requirements of due process … are notice and an opportunity to respond."). More specifically, plaintiffs are "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.*; *Hanton v. Gilbert*, 36 F.3d 4, 7 (4th Cir. 1994).

For notice to be sufficient under the *Loudermill* test, the notice must be "'timely under the particular circumstances of the case'" and it must apprise the Plaintiff "'of the nature of the charges and general evidence against him.'" *Linton v. Frederick County Bd. of County Comm'rs*, 964 F.2d 1436, 1439 (4th Cir. 1992) (quoting *Gniotek v. City of Phila.*, 808 F.2d 241, 244 (3d Cir. 1986)). Elaborate or formal procedures are not required; the purpose is to provide "an initial check against mistaken decision." *Loudermill*, 470 U.S. 532 at 545–46.

Distilling these statements, these are the elements of a procedural due process analysis involving an employee plaintiff: (1) the plaintiff must be given notice, which must (a) be oral or written, (b) be timely under the circumstances, and (c) describe the nature of the charges and general evidence against the employee; and (2) plaintiff must be given an opportunity to present her side of the story.

Turning to Plaintiff's case here, there can be no doubt that she was provided adequate notice. This Court has already found that Plaintiff had adequate notice, (*see* Mem. Op., October 24, 2006 at 7–8 (docket entry no. 27)), and there is nothing before the Court that changes that finding. Plaintiff argues, in part, that she was never "given notice that her email might have violated policy DRHM 1.75." But as the Court stated in its earlier memorandum opinion, "'[d]ue process does not mandate that all evidence on a charge or even the documentary evidence be

-21-

provided' in an employment dismissal case." *Id.* (quoting *Linton*, 964 F.2d at 1440). Plaintiff need only be provided "such descriptive explanation ... as to permit [the employee] *to identify the conduct giving rise to the dismissal* and thereby to enable him to make a response." *Linton*, 964 F.2d at 1440. There is simply no question that Plaintiff was aware of the conduct giving rise to her dismissal.

As for the second prong—an opportunity to be heard—very little is required. *See, e.g.*, *Loudermill*, 470 U.S. at 545 ("[T]he pretermination 'hearing,' though necessary, need not be elaborate."). But Plaintiff must be given the chance to communicate on her own behalf. *See id.* ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.").

Here, there is conflicting evidence as to whether Plaintiff was given an opportunity to present her side of the story. Plaintiff says she was told she would not be allowed to speak at the November 22 hearing. Childs-White and Scurry dispute this account. There is therefore a genuine issue of material fact.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgement will be denied, Defendants' motion for summary judgment will be granted in part and denied in part, both in an order to follow. Trial will be limited to the question of whether Plaintiff was given an opportunity to be heard.

It is so ORDERED.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

-22-

ENTERED: _Norman K. Moon_
_____
United States District Judge

_March 16, 2007_
_____
Date

-23-